HON. ALANSON H. BARNES, ⎫
⎬ ASSOCIATE JUSTICES.
HON. GRANVILLE G. BENNETT, ⎭

### THE TERRITORY EX REL. MCKINNIS V. HAND.

1. *COUNTY OFFICERS:* APPOINTEES: TERM OF OFFICE. County officers appointed by the governor on the organization of a new county, hold until the next general election ensuing after such organization, in which their successors must be elected.

2. ———: ———: ———. If the next general election after such organization be not one at which county officers are chosen for a full term, the successors of such appointees must be chosen to fill the unoccupied term.

3. ———: ———: ———. The appointees hold until the next general election, and until their successors are elected and qualified; and in the absence of any statute fixing a positive time, the officer elect is entitled to the office and its emoluments as soon as the result of the election has been officially declared, and he has qualified as required by law.

*Appeal from Lawrence County District Court.*

THE facts are stated in the opinion.

*G. C. Moody* and *S. L. Spink* for appellant.

The record in this case discloses the fact that before the application for mandamus, the appellant, as county clerk, had performed the duty required of him by law, by making out and delivering to the sheriff the notices of the election, to be held on the 6th day of November, 1877, incorporating in such notices such offices as were in his judgment to be filled at such election, to-wit: the justices of the peace for the county,

and one county commissioner, and the respondent sought by the application to compel him to amend his notices and issue new ones, incorporating therein the offices of register of deeds, sheriff, treasurer, judge of probate court, district attorney, coroner, superintendent of public schools, assessor, and the other two county commissioners.

This raises the question squarely, whether it was his duty to incorporate into such notices the names of the last above named offices, and thus the question is raised whether such named offices were to be filled at the election thereafter to be held on the 6th day of November, 1877.

On behalf of appellant, we claim that it was not his duty to name these offices in his notices, because they were not offices which by law were to be filled at the election in 1877, for the reasons: 1st, no vacancy was shown to exist; 2d, the power of appointment had been given to the governor, and had been exercised under the special act; said officers, so appointed, were to hold their offices until their successors should be elected and qualified according to law; and 3d, there was no law authorizing the election of such officers until the general election in the year 1878. (§ 15, p. 42 of the Revised Codes.)

This special enactment cannot, by any fair construction of it, when speaking of the election and qualification of the successors to these offices, be held to refer to any other enactment providing for special cases, but must be held to refer only to the general law upon that subject, to-wit: to the provisions of said section 15, referring to the officers of organized counties. This became an organized county at once, upon the appointment of these officers by the governor, and their qualifying.

No where in the statutes is there found any provision for the election, in organized counties, of such officers, save in said section 15, which provides for their election in 1878, and every two years thereafter.

Section 3 of said chapter 21, relating to counties and county officers and the organization of counties, (page 40, Revised Code), provides that county commissioners appointed upon the petition of fifty voters and upwards, may appoint county officers, and that such officers so appointed by such county

commissioners should hold their offices until the next general election, and until their successors shall have been elected and qualified, but does not provide for such limitation of the term of officers appointed in any other way, or by any other tribunal or authority. And therefore it would be *legislation* and not *construction* to tack those special provisions relating to the counties in the Black Hills, when no reference whatever is made thereto.

But even under that law we do not concede that the officers thus appointed, if appointed previous to election in an odd year, would only hold until the election of that odd year; for such a construction would make the term of the officers then elected but one year, whereas the term of all such officers when elected, except county commissioners, is made two years by law.

Again, in support of the view we take, we call the Court's attention to sections 8, 11 and 12, pages 60 and 61 of the Revised Codes, in which it is provided that all vacancies in these disputed offices shall be filled by the board of county commissioners, and appointments to vacancies thus made shall continue until the next general election *at which the vacancy can be filled.* And persons thus appointed shall qualify in the time prescribed in their appointment, whereas by sections 9 and 10, pages 10 and 11 of the Revised Codes, officers elected are to qualify and enter upon the duties of their office on the first Monday of January next succeeding their election, or within ten days thereafter. And their terms commence on the first Monday of January next succeeding their election.

No where in the statutes can be found a provision limiting the terms of these officers, when filled by election, to less than two years. On the other hand by chapter 23, page 224, laws of 1862, the terms of these officers are expressly fixed at two years, and as to the term of such offices that chapter has never been repealed. But by the construction of this Black Hills enactment contended for by respondent, the terms of all these offices filled by election in 1877, would be, by implication merely, limited to one year. This, we repeat, if followed by the courts, would be legislation and not construction.

As seemingly to enforce our view of the proper construction of this Black Hills enactment, we find an express exception in the case of justices of the peace, they being by the 8th section thereof, only to hold until the election in 1877. And if it was the intention of the Legislature that all the other officers should hold only until that time, why single out and expressly mention justices of the peace. Does not the rule here apply, " that the express mention of one class excludes the others." (Dwarris on Statutes, page 221.) Counsel also cited the following statutes, bearing generally on the points discussed: Ch. 40 § 3, Ch. 42 § 15, and Ch. 22, Political Code.

*McLaughlin & Steele*, for same.

This is an appeal from an order of Hon. Granville G. Bennett, judge of the District Court of the First Judicial District, in and for the county of Lawrence, ss., who issued on the —— day of October, 1877, a peremptory mandamus to the defendant, commanding him to give notice of a general election for county offices in said Lawrence county, on the 6th day of November, 1877. The question involved and presented to his honor, and which he decided affirmatively, was: " Does the law of Dakota require an election for county officers at the election to be held on the 6th day of November next?"

From the order of the judge, an appeal was taken to this court.

We think there was error in the ruling of his honor, and that the same should be reversed, on technical grounds, as well as on the merits.

On strictly technical grounds, the alternative writ of mandamus issued and served upon the defendant, citing him to show cause why a peremptory writ should not issue, was not under the seal of the court, and therefore was a nullity. (*People v. Fisk*, 1 Hun.)

In this Territory we have "orders" and "writs." The former is defined by section 509, Code Civil Procedure, to be: "every direction of a court or judge, made or entered in writing, and not included in a judgment." Thus we have the " order of arrest," which is issued by the judge of the court in which the action is brought, (§ 150) and the "order of injunction," which is issued by the court or judge, (§ 188.)

The sections of the code referring to and regulating the remedy by mandamus, speak of it as the " writ," and " writ" it should be. (§ 695, 696, 697, and following sections to 706, inclusive.)

A writ is defined to be: " A mandatory precept, issued by the authority, and in the name of, the sovereign or state, for the purpose of compelling the defendant to do something therein mentioned. It is issued by a court or other competent jurisdiction, and is returnable to the same. It is to be *under the seal*, and is directed to the sheriff or other officer lawfully authorized to execute the same. (3 Blackstone, 273; 1 Qidd's Practice, 93; Gould's Pl. & Pr., ch. 2, § 1; 2 Bouvier's Dict., 680.)

It may be contended that § 8, p. 510, Code Civil Procedure, obviates the necessity of the writ being under seal, because it is there said that the word "writ" signifies an order * * in writing, issued in the name of * * a court or judicial officer. If it said, issued *by* a court or judicial officer, instead of " in the name of," disputation would end, and " writ" and " order" would be convertible, as well as synonymous, terms. It seems that the fair construction of this provision, is that the order or precept must be tested " in the name of the court or judicial officer," and does not dispense with the necessity of being under seal.

The writ of mandamus should not issue, where there is a plain, adequate remedy at law. So held in a large majority of reported cases. Special reference is made to the following: *People v. Sup. Chenango Co.*, 11 N. Y., 563; *People v. Hawkins*, 46 N. Y., 9.

The validity of an election in this territory does not and cannot be made to depend, under existing law, upon the publication of an election notice or call by the clerk. The privilege of voting is conferred by Congress, and certain qualifications are imposed on the voter by the Legislative Assembly. Those possessing the requisite qualifications are entitled to vote at any general election, and do not derive any political power or privilege from the act of the county clerk, in publishing an election notice, nor would they lose any by his omission to do so.

*Bartlett Tripp* and *Gamble Bros.*, for appellee.

Cited and relied on the following authorities: *State v. Gamble*, 13 Fla., 9; *State v. Conrades*, 45 Mo., 45; *State of Oregon v. Johns*, 3 Oregon, 533; *Wolsen v. Cobb*, 2 Kansas, 32; *McAlfee v. Russell*, 29 Miss., 84; Dwarris on Statutes, 189; *Patterson v. Winn*, 11 Wheat., 385.

BENNETT, J.—The Territorial Legislature, by an Act approved February 10, 1877, provided for the organization of the counties of Lawrence, Pennington and Custer, and authorized the governor to appoint all the officers for said counties except justices of the peace. The Territory embraced within these counties, was, at the time of the passage of said act supposed to be within an Indian reservation, and the act provided that nothing should be done by the governor towards the organization of said counties until the Territory embraced within them should come within the jurisdiction of the Territory.

After the ratification of the Sioux Indian treaty by Congress on the 28th day of February, 1877, the governor appointed the officers for said counties, among others the appellant as register of deeds and *ex-officio* county clerk of Lawrence county, and issued commissions to his appointees, running until January 1st, 1879, and until their successors should be elected and qualified.

The same act provided for the election of four justices of the peace in each of said counties, at special elections to be called by the respective boards of county commissioners, when organized, who should hold their offices until their successors should be elected at the general election in 1877, and should qualify.

Prior to said general election the board of county commissioners of Lawrence county spread the following minute on their records: " We will, therefore, call an election for four justices of the peace, and for no other officers;" and appellant, at the proper time, as clerk of said county and in compliance with the provisions of section 5, chapter 27, Political Code,

made out and delivered to the sheriff, election notices, naming as the officers to be chosen—four justices of the peace—but no others, whereupon this proceeding was instituted by the relator for a writ of mandamus to compel the appellant, as county clerk, to issue notices of election for the election of three county commissioners, one register of deeds, sheriff, treasurer, judge of probate, &c. An alternative writ was issued, and on the hearing the court below awarded a peremptory writ. From this judgment and final order defendant appeals.

Section 5 of chapter 27, Political Code, above referred to, reads as follows: "The county clerks of the several counties shall, at least thirty days before any general election, * * * make out and deliver to the sheriff, coroner or other person to be designated by them, of their respective counties, three written notices thereof for each election precinct." The form of the notice prescribed by the same section, requires that the offices to be filled at such election shall be named therein. In this case the clerk, in the notices made out by him, named only the office of justice of the peace, and this appeal presents the naked question, whether such notices should not have included all other offices of Lawrence county, which under the law are filled by election; or in other words how long are the appointees of the governor entitled to hold, and when should their successors be chosen. Turning to chapter 42, Political Code, providing for the organization of these Black Hills counties, including the county of Lawrence, we find that sections 1, 2, 3 and 4, defines their boundaries; section 5 is repealing in its character, and section 6 reads as follows: "The governor is hereby authorized, and it is made his duty, when the country embraced within said counties herein described comes within the jurisdiction of this Territory, or as soon as practicable, and he can obtain the necessary information after the passage and approval of this act, and without the petition of voters otherwise required, to appoint for each of said counties three county commissioners, who shall constitute the board of county commissioners, one register of deeds, one sheriff, one treasurer, one judge of

the probate court, one district attorney, one coroner, one superintendent of public schools, and one assessor; and said officers so appointed shall hold their offices respectively until their successors shall be elected and qualified according to law." Section 7 relates to the qualification of the officers so appointed; section 8 provides for the election of justices of the peace at a special election; section 9 defines a quorum of the board, the duties of clerk, etc., and section 10, is as follows: "This act shall take effect and be in force from and after its passage and approval, and it amends and modifies all acts and parts of acts inconsistent with its provisions, so far only as it is necessary to carry this act into effect, but all other such acts, except those bounding and defining counties herein defined, are in force, except so far as this act governs and takes the place of other law." This is all there is of special legislation relating to these counties, and we must look elsewhere for an explanation of some of the phraseology used in this act. It will not be contended but what these Black Hills counties might and could have been organized without any of the provisions of this special act, except those embraced in the first five sections, naming them and defining their boundaries. Sections 1 to 5 inclusive, of chapter 21, Political Code, clearly define the mode and manner, and confer ample power and authority for the organization of new counties, and it seems clear that these statutes must be construed together, chapter 42 as being merely supplemental, for a special purpose, to the sections last cited. They certainly both have the same purpose in view and relate to the same subject-matter.

It is an established rule of law, that all acts *in pari materia* are to be taken together as if they were one law; and they are directed to be compared in the construction of statutes, because they are considered as framed upon one system and having one object in view. (Dwarris on Statutes, 189.) And the Supreme Court of the United States, in the case of *Patterson v. Winn*, 11 Wheat., 385, has laid down the rule that "several statutes that are *in pari materia* are to be construed as one statute in explaining their meaning and import."

A very cursory examination of the statutes under consideration will conclusively show that they are *in pari materia*, and that the Legislature had the provisions of the general law (chap. 21) in view all the time when framing this special act. By section 6 of the act last referred to, the governor is authorized to appoint the officers for these counties, " without the petition of voters otherwise required;" where and by what law required? The answer is to be found in section 1, chapter 21, " whenever the voters of any unorganized county * * shall be equal to fifty or upwards, and they shall desire to have said county organized, they may petition the governor, etc. Why were the Black Hills counties made an exception to this rule? The Legislature took notice of the fact, which was notorious, that there were several thousand voters in these counties, without county government, without courts, and without any of the machinery of the law for the protection of life and property, and the various, vast and valuable interests that had sprung up like magic in that new country; the distance from the capital of the Territory, and there being no United States mail carried into the Hills, communication was slow and uncertain; the desire of the people for county organization was well known, and to have waited for petitions could have served no practical purpose, and would only have prolonged the rule of anarchy and confusion; therefore to save time and hasten the consummation of the purposes of the act, this provision was inserted and the petition dispensed with. And for the same good and cogent reasons, we apprehend, the governor was empowered to appoint all the other officers, except justices of the peace, for these counties. This, we think, is a satisfactory answer to the somewhat specious argument of counsel, contending that the provision authorizing these appointees to " hold their offices respectively until their successors are elected and qualified according to law," must refer to section 15 of chapter 21, and not to section 3, same chapter; and that unless their construction is adopted, " all the legislation in chapter 42, outside of naming and defining the boundaries of said counties, was an idle exercise of power."

Chapter 21 only authorized the governor to appoint three commissioners, who, after having qualified, should appoint all the other officers. These provisions to which we have referred, together with the one requiring justices of the peace to be chosen at a special election, are the only departures of importance from the general law governing the organization of new counties, found in this special act. Now coming back to section 6, chapter 42, where it provides that the appointees of the governor "shall hold their offices respectively until their successors shall be elected and qualified according to *law*," we are met with the question, what law is referred to? If this special act had stopped with section 5, could there have been any question as to when their successors would have been elected? Certainly not. Sections 2 and 3, chapter 21, provides that the commissioners appointed by the governor and the officers appointed by them "shall hold their office until the *first general election thereafter*, and until their successors shall be elected and qualified." The officers of Lawrence county were appointed and qualified in the spring of 1877; the "first general election thereafter" occurred on the Tuesday next after the first Monday of November, 1877. (Section 2, chapter 27, Political Code.) Reading these statutes together, can there be any doubt as to the proper construction? Why attempt to make these counties an exception to the well settled rule fixed by legislation governing the period for which persons hold under appointment to an elective office? As we have seen, under the general law relating to the organization of new counties, the officers appointed hold only until the next general election; and section 11, chapter 22, Political Code, provides that appointments to fill vacancies must be made to continue until the next general election and until a successor is elected and qualified; and my attention has not been called to any provision authorizing an appointment to an elective office to extend beyond the next general election, when the people may choose for themselves. We do not say this could not be done by appropriate legislation, but we say it has not, and courts should not, by a forced and strained construction in antagonism to the spirit and letter of general statutes, and the well

recognized legislative policy of the Territory, do that which the law-making power has carefully and studiously avoided. Much stress has been laid by counsel for appellant on section 15, chapter 21, which provides that the officers of each or- ganized county shall be chosen at the general election in the year 1878, and every two years thereafter. This section has reference to the election for a full term, providing that the election of these officers shall occur at the same time, and making the tenure of office and the time of its commence- ment, uniform throughout the Territory, and has no appli- cation whatever to cases of vacancy, or the election of the successors of officers appointed upon the organization of a new county. Were this not so, and were the construction insisted upon by counsel for appellant correct, then sections 2 and 3 of this same chapter, and section 11 of chapter 22, and the provisions of the section under consideration, could not stand together; for if their reasoning be good·in the case at bar, it must prevail in every other case involving the con- struction of these acts, and consequently no officer can be voted for to fill a vacancy or otherwise, except at the general election in the even years. This cannot be claimed to be the legislative intent.

Our attention has also been directed to section 8 of this special act, as throwing light on the question before us. This section provides for the election of justices of the peace at a special election to be called by the board of county commis- sioners, and enacts that the justices so elected "shall hold their offices until their successors shall be elected at the general election in 1877, and shall qualify." It is asked if all the officers were to be elected at the general election in 1877, why specify in particular the office of justice of the peace; and it is contended that the naming of one necessarily excludes all others. This by no means follows. The Legislature doubt- less considered the law as to the election of the successors of the appointees, fixed and certain; but here they had created an anomaly, had authorized the election of justices of the peace at a *special* election: how long should they hold the office, and where is the provision of law settling the question?

In order to avoid doubt and confusion, these officers were placed on the same footing with those holding under appointment, and their successors elected at the same time. Can there be any good reason for a construction that requires the officers chosen by the people to retire at the next general election, while those appointed must be permitted to hold over for a year longer? In the absence of any plain and unequivocal statute, we would hesitate long before placing a Legislative body in so unenviable a position before the people.

The view we have taken of the questions presented by this appeal, seems to be in consonance with the generally received doctrine as held in analogous cases. An article in the Florida constitution providing that "when any office from any cause shall become vacant, and no mode is provided by this Constitution, or by the laws of the State for filling such vacancy, the governor shall have power to fill such vacancy, by granting a commission which shall expire at the next election," was held by the Supreme Court of that State to mean that the power vested in the governorship is not a power to fill the office for the unexpired term; that power remains with the people; the power conferred is to provide an incumbent for the office between the date of the removal or death of the regular incumbent, and the filling of the office by an election by the people; and although the Constitution does not fix the precise time for the next election," yet it is the duty of the authorities to see that the time of this election is not indefinitely postponed at the expense of the rights of the people. (*State v. Gamble*, 13 Fla., 9.) The same principles are enunciated in the case of *McAlfee v. Russell*, 29 Miss., 84.

Under a Missouri statute, providing that when any one of the judges of the county court shall vacate his office, for any reason other than the expiration of his term of service, the governor shall appoint " until the next regular election," a suitable person to perform the duties of his office,—it was held that the term of office of a judge appointed by the executive continues only until the next general election, and not till the next regular election of county judges. (*State v. Conrades*, 45 Mo., 45.)

The Constitution of Oregon provides that in case of a vacancy in the office of Judge, "the governor shall fill such vacancy by appointment, which shall expire when a successor, shall have been elected and qualified." This provision is quite vague and indefinite, and it does not appear that the Supreme Court of that State, were able to find anything in their Constitution or statutes that materially assisted them in construing it. Yet in the case of the *State of Oregon v. Johns*, 3 Oregon, 533, that Court say: "The people of Oregon by their Constitution made their judiciary elective, and only gave the executive power to fill temporary vacancies, which should occur between elections. If the people had intended to part with this power of appointing county judges, they would have expressed it; it cannot be inferred. No inference or intendment is ever presumed against the sovereign. Such is the universal rule for the construction of statutes, for they emanate from the sovereign power which, in this State, is the people. They appoint the executive, and he only acts by delegated authority, and this authority cannot be presumed beyond the express words of the grant. And I think the power in this case only extends to the filling a vacancy until the next general election, when the people can regularly exercise their authority in electing officers. I think it is not reasonable to presume that, where the people have reserved to themselves the appointment of an officer, they would confer on the executive the filling of a vacancy in the office, which would extend the time of the appointee beyond a general election, and deprive the whole people of a county from electing their local officers, when they could fill it as conveniently as they appointed the original incumbent." If this reasoning can be applied in a case involving the filling of but one office, how much more forcible will be its application to the case at bar, where the right of the people of Lawrence county to fill by election, not only one office but all their most important local offices, is presented for adjudication. And while properly speaking, there is no sovereignty lodged in the people of a Territory, yet Congress gave in our Organic act the power to the Legislature and governor to determine whether these

officers should be elected or appointed, and the legislative power, true to the principles of republican government in its simplest form, provided for their election among the earliest enactments on our statute books, and there is no impropriety in saying that the right to choose their local officers, is lodged with the people of this Territory, and for the purposes of this case it matters but little how that right may have been conferred, whether by a Constitutional provision or an act of Congress, aided by their own legislation, the material point is, they possess it, and hence the rule of construction is the same, when various statutes effecting this right are under consideration.

We are clear in the opinion that the voters of Lawrence county had the right under the law to choose all their county officers, that are elective, at the general election in 1877, and that the peremptory writ of mandamus was properly granted.

Two other incidental points are worthy of notice. For what term or period are these officers elected, and when should they qualify? As the statute provides that they shall be elected at the general election in 1878, and every two years thereafter, except commissioners, it follows that the officers chosen at the general election in 1877 were so chosen to fill out an unexpired term, and that their successors must be elected at the general election in 1878. On the other point as to the time when the newly elected officers should qualify, I think there is not much room for doubt or difference of opinion. The appointees are to hold until the next general election, and until their successors are elected and qualify; and in the absence of any statute fixing a particular time, the officer elect is entitled to the office and its emoluments as soon as the result of the election has been officially declared, and he has qualified as required by law. The appointments running only to the next general election, cannot by intendment or construction be made to extend until the first Monday of January, as contended by counsel for appellant; and section 9, chapter 5, Political Code, applies to the qualification of officers elected for a full term, and not those elected to fill vacancies or unexpired terms; it reads as follows: "Except when otherwise

specially provided the regular term of office of all county. township and precinct officers, *when elected for a full term*, shall commence on the first Monday of January next succeeding their election." The words, "when elected for a full term," necessarily excludes those not elected for a full term, and the fair and reasonable inference is that they are left to enter upon the duties of their office at once.

All the Justices concurring, the judgment of the court below is

AFFIRMED.